Good morning, Your Honors. My name is Jeff Blank. I represent Kay Nichols, the appellant. I'd like to reserve about three minutes for rebuttal, and I'll watch the clock here and try to read the stop sign. Ms. Nichols went to a public school board meeting after work on her own time. A friend's getting an award, and her boss, myself, the general counsel, was on for possible termination. It's crowded. She takes a seat next to the general counsel. And if the general counsel is not dismissed, there's no problem, but at that meeting, he was dismissed. The day before, Defendant Dancer says, The job of the legal secretary, it's yours no matter who is general counsel, no matter what the board does. Now, after the general counsel is dismissed, Nichols goes home, and the next day, Ms. Dancer comes and says, Guess what? Because you went to this meeting and sat next to him, I have all types of problems with that. I'm going to freeze your salary, and you're going to be a human resources tech, and you should think of retiring. And Ms. Nichols retired. What's at issue, and the problem with that is Nevada Statute 241020 states, except as otherwise provided by specific statute, all meetings of public bodies must be open, and the public and all persons must be permitted to attend. That's what Ms. Nichols did. She attended a board meeting. Now, this Court already ruled in this case back in 2009, Nichols v. Dancer. We were here once before. And the Court ---- Roberts, thank you. So let's just get right to the heart of this. So the district court took a look at the constitutional issue, which I understand is kind of a hybrid speech association kind of claim, is that right? Yes. As well as I think the ---- Her presence sitting next to Mr. Blank at the meeting could be construed as an expression, as expressive conduct. It also could be the claim could also be based on her association with Blank. Right. But there's one more aspect the Court didn't consider. And some of these cases point out showing up at a meeting is expressive conduct, that she's concerned with what's going on at the meeting. All right. But bottom line, we're at a ---- you've got a First Amendment claim. Yes. That the district court, even the district court said, raised issues of public concern. Yes. So then we're into the Pickering balancing test. Correct. And when the district court went through that test, the district court struck the balance in favor of the district. Correct. Right? Correct. Where did the district court go wrong in assessing that balancing? Well, where it went wrong is relying on what this Court already held. They said Nichols' job performance was always good and received commendable. So if you go in the past, there's no problem with past conduct. They keep raising past conduct as an issue. There's no discipline, there's no problem. Also, this Court stated unrefuted that Nichols says, yes, I want you to support a friend and see what's going to happen. And she ---- But, you see, I think the underlying question, whether it's legitimate or not, is a ---- as the district said, it's a loyalty question. In other words, she's in a confidential position. Can we ---- can she be trusted to continue in that in light of what happened? Well, sure. Where does that leave you? There's no problem there, because the district court misstates the facts. Ms. Dancer never took action contrary to the district. The district can only act through the board. In November, January, all these prior activities, there was a dispute between General Counsel, myself, and Hager. We were both board employees. In other words, it was a check and balance system. So the issue, and in all the record states, there was issues going on with Defendant Hager. And the Court goes and says, well, look at that, she has problems with the district. No, no. The district delayed and didn't do anything until March 23rd at the board meeting. At the board meeting, they didn't say, okay, you know, Mr. Blank, you're gone, he stays. After that point, by showing up, they're saying, well, can I doubt Ms. Nichols' loyalty. It's like she never did anything contrary to the Washoe County School District. So the one question is, the one issue is sitting next to you at the meeting. Is there any issue as to her conversation with you on the day that you were told that you were going to be let go? No. There's no issue. There's no problem with that. There's no issue with that. There's not even any evidence of what we discussed sitting there in the audience. And there may not be evidence now, but does it give you any pause for you to be counsel to her when you might well be a witness? That she may potentially be a witness. No, you are. Her trial. In this case. You might be a witness in this case. And she'll be a witness in your case. Yes, it did give me some pause. At the time when we brought this action, it was, what are we going to do? No one seems to be able to want to take an action against the school district in these matters. And I said, look, I think you have a fundamental right to go to the board meeting and find out what was going to happen. What happens in the fact that you got punished because of it, I said, no, you know, we don't want to let that go. My issue and the primary reason I said I can sidestep that was Ms. Nichols stated, well, the day before the meeting, everything's fine. I'm not going to lose my case. You're answering my question. My question is, you're likely to be a witness in this case. How can you be a lawyer? Well, and that's what I'm getting to. The potential there is if this Court holds and the trial court says, look, anything that happened before the board meeting is irrelevant, because Dancer says the day before the board meeting, I have nothing to testify to. In other words, what did Dancer say to you the day before the meeting? The job's yours no matter what. You're fine. It's all yours. You go to the meeting and she says, because you went to the meeting and just sat next to me. And we can stipulate to that, yes, she sat next to me, not because of what you potentially said. That's not what Dancer's testimony is. Just because you sat there, I'm inferring support. So I don't have to testify to anything at the trial. Well, there was some, as Judge McKeown alluded to, I think that day, or was it the day before or something, there was some testimony that she had a, that Ms. Dancer had a conversation with you. No, no, no. The last conversation Dancer had with me was back in January. It was November to January that these disputes and confidential files and all these things. Well, maybe I misunderstood the dates, but I thought there was some, some testimony that she spoke with you. No. That day or, yeah, I think it was that day, the 23rd. There might be some mistaken facts, but I think if you look at the record, in January when I was locked out and disappeared from the district, I had no more contact with Ms. Dancer or anybody. So Ms. Dancer's last conversation was when she came in and said, the superintendent is suspending you. I want your keys. Then she goes and talks to Nichols, and that's in January. I thought, well, I thought Nichols informed you or in a conversation that the district was bringing in a new counsel. In January. That, it didn't occur, it didn't occur around the time of the meeting. It was in January that she said, look, they're coming to take the files. What am I, you know, she's in a dilemma. Right. What do I do, because the superintendent and the defense counsel here are coming to get all the files. And I was like, well, the board didn't fire me. My job with the board was still to handle these matters in-house. That was the whole purpose of hiring general counsel, and now they're being, they're being raided. Let me ask you, when she had that conversation with you, were you still employed at the board by that time? Sure. I was employed until March 23rd. In other words, the board was the only one that could fire me, so it was a very complex for Ms. Nichols. You know, she's caught in this tug of war, and what does she do? It was never, if the board had taken action in January, we wouldn't be here probably, but they didn't. So Ms. Nichols is in limbo. So the issue of my testimony, how do you look at that, how do you get by that, when she told me, when she, and as I stated in her affidavit and her deposition, the day before the meeting, there's no, I have no problem. And there is no evidence to contradict that. And also an issue there is Dr. Hager's testimony is Dancer never told him about any of this. Ms. Dancer testified, yes, I did. Direct conflict. No testimony from Dr. Hager that he had a problem with Ms. Nichols. There's no board testimony that he had a problem with Ms. Nichols. The cases, I think, that help give guidance are what I cited, the Woods v. Whitland from the Third Circuit. There was a right to attend a planning commission meeting. You have a right to go. And what the Court said there was that the public access is guaranteed. That's what we're talking about here, public access to a meeting. If Ms. Nichols can't go to this board meeting, by State law and even school district reg that says I can, it's like, what does it mean? You didn't move for summary judgment, is that correct? Pardon? You did not move for summary judgment. No. So if we were to reverse this case, what would happen next? My hope is to go to trial after summary judgment. Well, let me ask a question about that. I want to follow up on Judge McKeown's question, which is I noticed when I looked at the motion, the district summary judgment motion, that they also said, you know, I thought they also raised the question of qualified immunity. Correct. Okay. So when the district court looked at this, the district court said, well, you take all the facts in the most light favorable to your client. I just don't think she's got a constitutional claim here. Summary judgment for the district. The district, the court didn't go on to say, well, even if she has a constitutional claim, under the case law, the case law was not clearly established, and, therefore, the conduct here was reasonable, and, therefore, they're entitled to qualified immunity. Now, that the district court didn't reach that issue. That issue hasn't been briefed to us. So if it goes back, isn't there are they going to go back and ask the district court to consider qualified immunity if we were to reverse? Possibly, yes. My first choice is to go to trial, because then we can have all matters heard and maybe one final appeal versus interim appeals again. But on the qualified immunity aspect, having a State statute and a district regulation saying you have a right to show up at these meetings, it's like, I'm not sure, you know, is it a known constitutional right? According to Woods and Whitland, it's a constitutional right. And also according to Smith. Well, is it so clear that the Pickering balancing test tips in decidedly in your client's favor? I think so, because the Gilbrook decision says the more fundamental the right, the higher the, you know, the balancing has to be. Let me just give you a, let's, I think the district would, won't probably disagree that under the open meetings, et cetera, that these meetings are open and anybody can show up. But what if she showed up at the meeting and sat next to you and you had a long-engaged discussion about something which could be observed and further, and I'm not suggesting this happened, but further there was some kind of amorous contact or something. So you, she showed up at a meeting she had a perfect right to be at, the district says, yes, she could have been there. I mean, but then she did A and B. Would that change it? I mean, isn't, so it's not really just showing up at the meeting, is it? Well, I think in this case, well, it is because there, I understand the factual scenario, but you also have unrefuted that Ms. Dantzer never told Ms. Nichols not to have any contact with general counsel. That's in the record. She was never directed not to talk, okay? She could have. And if the district felt she did wrong before, they could have disciplined her, they could have done all these things prior to the meeting. But I think what this Court held in the, in your previous decision was accurate, saying aside from Nichols' seat next to blank, there's no other reason why Dantzer would reconsider her decision. So if you focus on that, saying, well, what if she, what if there was one chair between the two of us? You know, is that okay? What if she sat behind me? You know, is it the fact that, well, did we talk that gives her rise? But the whole point I have is if we're talking, she sees us in the mall talking. Not at the public meeting. You want to say to somebody, because you're here and where you're sitting, you could be subject to discipline, whereas in the Smith v. Harris case, it says the plaintiff's right to attend can't be a serious question, and the Court said plaintiff's motive in and of itself is not the issue. Absent any evidence of disruption, defendants could not, in evaluating plaintiff's suitability for employment, negatively assess plaintiff's mere attendance at the school committee without infringing upon her First Amendment rights. And I'd like to reserve some of my two minutes now. Thank you. Kimbrough, I'm counsel for the appellees in this matter. I'd like to start, I think, Judge Baez, you wanted to get right to the heart of the matter, and I think that's appropriate. While the district would potentially disagree or does disagree with Judge Hicks' ruling on the first issue of expressive conduct in that, I don't think we need to get to that, because I think the Pickering analysis and your issue on qualified immunity really get to the heart of it. With respect to the Pickering analysis, I think that the analysis that you raised that in your motion for summary judgment? We did. We believe it was not a matter of public concern, and I do believe that it was not an issue of expressive conduct. No, that's, did you raise the qualified immunity? Oh, we did. It's briefed as an alternative. It is briefed as an alternative in the motion for summary judgment. The district court just never got to it. They didn't get to it because they determined on Pickering that the school district and the individual defendants won. Right. With respect to the Pickering analysis, a couple of things I think are important to remember. First of all, a governmental employer is allowed wide latitude in the managing of its own internal affairs as a threshold. You know, we're real familiar with the Pickering standards. So does it, basically, is there anything she did that merited this dismissal other than sitting next to him at the counsel meeting? Yeah, because it's a contextual analysis. I mean, looking at the context of what happened when she sat down the next day and said, we're not going to put you back in your original position, you don't just start with the March meeting. You have to go back to the beginning of this, which was in November of 2003. There was a meeting about Mr. Blank's employment that Ms. Dancer was present at, and Ms. Nichols was asked by Mr. Blank to attend specifically to take minutes of that meeting to ensure the accuracy of everything that was said. That's the kind of beginning of it. From that point forward, we have a series of things that have occurred. We know that Mr. Blank was in the meeting. What was the stated reason? In November? No. What was the stated reason for the change in her position and giving her the alternative either to retire out or go to this other position? The stated reason was that after seeing her sitting with Mr. Blank at the meeting the night before, that she requestioned or rethought putting her back in that position because she was concerned that the continued association demonstrated a loyalty that could be potentially a problem and create a conflict for the functioning of that legal department because there's no question. And that's the only reason we can look at, isn't it? Well, no. I think the context is broader than that. I think that's overly simplistic. That's just causing her to rethink her concern. I think you have to look at everything that's happened prior to that. And in particular, it's important Judge Payaz was asking the question, what happened in this meeting in January of 2004? At that meeting, Mr. Blank was notified that he had been suspended. Excuse me. Ms. Nichols, and this is uncontroverted in the deposition testimony, went down to Ms. Dancer's office and was informed that she was now to report to her with all matters related to that particular office, specifically asked to prepare a list of all pending cases so they could get some control over the office and understand what was happening, and advised that outside counsel was going to be coming in to review those files. That's on a Friday afternoon. Ms. Nichols then has a conversation on the telephone with Mr. Blank where she tells him that outside counsel will be coming in on Monday to be looking at those files and to kind of get a handle on the office. The importance of that is it shows that there was a violation of confidential information that was given. What was confidential about that information? Because it was Mr. Blank still had keys to the office at that time, and there was some concern about the staff. How does the fact that he had keys make the information confidential? Those files, some of the files went missing, Your Honor. As a result of that conversation, when outside counsel goes back in on Monday, that some of those files are no longer where they were and have gone missing. Had they been moved? Had they been taken out of one office and taken to another office? Or had they been removed from the building? They were not removed from the building. I believe ultimately they were found somewhere else in a file cabinet that they had never been used. So many of them were found in a file cabinet that they had never been used. Well, was there some allegation or some concern that Ms. Nichols was responsible for removing the files or trying to hide them or something? I think there was the issue for us was, and the Court has acknowledged this, it isn't actual disruption, although I think we have that. It's reasonable predictions of future disruption are also relevant. That comes out of the Hudson case and the Moran case. In this context, when you look at the totality of circumstances, it was reasonable after seeing her sitting with Mr. Blank at that meeting to assume that there could be a similar occurrence or there would be similar breaches or confidential questioning. How long a period was that between the time he left and this conversation about saying, oh, we're going to bring in outside counsel, which hardly is monumental or confidential? It was the same day. It was the same day. No, but the time then, how long was that before the counsel meeting? It was two months. Two months. The meeting is in January. And doesn't that strain some credulity to say, okay, the day he leaves, she basically says, oh, well, we're going to get outside counsel in, okay, and then two months go by and she sits next to him, and now the conclusion the Court has to draw is, well, there seems to be enough there that we could infer disruption of her conduct. Well, I think again. And that's the conclusion we have to make as a matter of law to sustain your position as a matter of law. Well, I think as a matter of law, though, again, I'm going to focus on a reasonable prediction. And I believe in the totality of circumstances, starting back in November, you get to the point where there is a reasonable prediction. And one of the other factors. But how do you get there? Well, because we know that there's a number of factors that have come up, this in particular, that she has shared information with him. And then subsequently, I think it's the same. She has shared information with him, detailed those for me. In the deposition testimony, it's clear that, and this is discovered after, but it goes to validating. No, it doesn't go to, you know, the point is that you have to make the decision based on the reason that the government did something, not to validating something after the fact. What was known that was the basis? So you say there's a number of factors. What was known? Specifically, what was known was that she had been asked by Mr. Blank to attend a meeting to take notes for him in November. It was known that he had retained counsel. It was known that he had filed a lawsuit. It was known that she had spoken with him and advised him that outside counsel would be coming in to gather files and get information. It was known that those files then went missing. And you got to recall, at that point, she's now in the Human Resources Department, so we didn't have that concern any longer. It was only after Ms. Dancer sees her associated with him at that meeting that it causes the light to go on again to say, I'm concerned. There's still an association. Let me ask you, was she you said you just said she was in the Human Resources Department. I thought she continued to work in the legal counsel's office. No, Your Honor. And that she reported to Dancer. She was actually functioning as a Human Resources tech, reporting to Dancer, and was not responsible for activities in the legal counsel's office. So she was so after the two months before he was actually fired, she was in the Human Resources office? She was. Was there a legal office during that period? It was not functioning. Outside counsel was handling it. Right. So there was no office for her to function. There was nothing for her to be doing in that office. And during the two months that she was working with Ms. Dancer, is that her name? Is there any evidence that there was any kind of disruption or, you know? Not with respect to the legal department. And again, I'm just talking because Dancer was her supervisor, right? No. No. They got along, Your Honor. The testimony is that they were collegial. And there was things were moving along? They were. Okay. And then she shows up at the meeting on the 23rd of January, whenever that was? She shows up at the meeting in March. And sits next to Mr. Blank. Yes, sir. And the next day? That caused Ms. Dancer to rethink her position that she was going to put her back. She was concerned that there could be reasonably predicting future disruption in that office if she put her back, because there's no question. She wasn't intending to put her back until a new general counsel was brought on. Well, I think she was going to move her back because that office actually functioned, did have some other functions besides just working as an administrative assistant. They acted as a liaison and provided information to people within the district and did some other things. But the importance, and what I was trying to get at, Judge McKeon, was I think the things that happened after the fact understandably don't impact the decision that was made, but they do demonstrate that it was reasonable to predict that had she been put back, there would have been issues. And there's things that are discovered after the fact that validate that. And that's the point I'm trying to get at, is when we're assessing a contextual analysis, whether it was reasonable, we can look at the facts that existed at the time, but the facts that come after that also demonstrate that. I don't know what's your best support for that. Well, I just think it's common sense that if you discover things after the fact, then that helps demonstrate that your intuition and the reasonableness with which you were acting was appropriate. Let me ask you. I don't have a case that says that we consider those, but I don't think it was inappropriate for Judge Hicks to consider those in looking at the totality of the circumstances. Was there anything in you've made twice now, or a couple of times now, you've made you've specifically noted that Mr. Blank, when he had the meeting, he invited Ms. Nichols to take notes of the meeting. Was there something improper about that? I don't know that I would characterize it as improper, but I think it gives a flavor of what was going on. Was, at that time, was she reporting to Mr. Blank? She was working with Mr. Blank. So wouldn't there be nothing unusual about Mr. Blank saying, you know, come with me, I want you to take notes? Well, in a meeting of that nature where they were going to be discussing his employment and the express purpose was to make sure that it was accurately reflected, it gives you an idea of what was, what the district was trying to do. There was nothing improper. I mean, what's she supposed to say? No, I won't take notes because I'm prescient and I can see this whole thing is going to blow up in my face? No, there was nothing improper. So the question is, it wasn't until the day he was let go that they told her not to take any direction from him, correct? No, that's not correct. She was told in January that from that point forward, when Mr. Blank was suspended. That's what I said, on the day he was let go. Oh, I'm sorry. He was suspended on that day. He was technically terminated. Well, or whatever, but that's only the first time anybody says to her, you know. That's correct, Your Honor. Don't take any direction from him. That's correct. And what's the evidence that Ms. Dancer, in terms of any knowledge of Ms. Dancer, that Ms. Nichols was taking direction from him? Is there any evidence after that point? Between then and March? Yes. No, there's no evidence until subsequently when the discovery is done and we find out a number of other factors, and that was one of the specific factors that was discovered that, in fact, they were communicating during that time. Do you know what they were communicating about? Well, it was generally – it's fairly vague in the testimony, but it's essentially about during work time about matters. When she was asked if it was related to his employment, she said it could have been. I don't really remember. I just remember we talked. I want to get to the qualified immunity point, Your Honor, in my – as you raised this issue, and I think it's a relevant one, in the context of when you first characterize this action as a hybrid of sorts, because it's predominantly associational, but it does have a component. Well, her presence there is expressive conduct. It is. And that's – my point is that in order for qualified immunity not to apply, it would have to have been clearly obvious that they were – that there was a violation of a constitutional right at the time. And my point is that in 2004, when she is not put back in her – in that position, the issue of the application of Pickering factors to a hybrid case such as this had not come down from this Court. It was actually Judge McKeon, you, in your opinion, in the Hudson matter a year later, actually, on a case of first impression, determined that a hybrid analysis, the Pickering factors would apply. So my point is that it was not clearly established at the time that she was not placed back in that position to apply. I mean, at this point, it's not really been briefed to us. If we were to disagree with you on the one point that's been briefed, wouldn't that be appropriate to go back to the district court? It – you can certainly send it back. In the community health decision that this Court issued last – last, I believe, was last fall, it was recognized that it really should be decided as early in litigation as possible, given the nature of the claim. And since we are in a de novo review scenario, I think it would be appropriate if you get to it to address that issue. Well, it was briefed in the – I guess it was briefed in the district court, but it wasn't briefed to us, because that's a – you know. It was not, Your Honor. I looked at the briefs, and nobody – nobody raises it here. Normally, this brief does, because the district court didn't rule on it. So it makes sense that, you know, he ruled on one issue. He didn't rule, as they often do alternatively. He did not. I'll reserve the rest of my time. Thank you. Thank you. It won't be redundant on the issues already covered. I agree with your comments and points that it goes forward from the time at the meeting that was the only thing they had to go on. Ms. Dancer, you know, this thing in January, files were missing. No, they weren't missing. They were in the legal file room. The defense counsel, who would also be a witness, because they're the ones that came in and worked with Hager to take the files, didn't know where the file room was. So in any event, that's just a sidebar. However, that if – if Ms. Nichols, she waits until in January, I'm suspended. She doesn't do anything wrong after. That's when they're – and the suspension was a contentious one, because only the board theoretically could suspend general counsel. General counsel was locked out, not being paid, which is a suspension. Any event, the board's action, what did the district do? March. The board says, Mr. Blank, you're gone. Okay. And now they're saying, I don't trust Ms. Nichols. Ms. Nichols, you know, on the other cases, there were no cases there. They were all with this defense counsel firm. All right? And who knows? It's pure speculation, will they come back or not. But the point is the inference, they're drawing inferences as to Ms. Nichols' motives and content. Ms. Nichols, the inferences at summary judgment are supposed to be drawn for the nonmoving party. And here we have the trial court, all inferences are made against her. Well, it's because of this and because of these past acts and all these – this after-learned information, and I think the court was correct. What did they know at the time? Ms. Dancer didn't say at the beginning of the meeting, the day before, you know, I got some concerns with you. But let's see what the board does. She says, unconditionally, it's your job. And so what disruption in the Pickering balancing test is, you know, what disruption – if Ms. Nichols kept going to board meetings after that, that's the issue, what disruption would there be to the school district? There wouldn't be any. Thank you. Thank you. Thank both counsel for your argument this morning. And the case disargues Nichols v. Dancer is submitted.
judges: Reavley, McKeown, Paez